[Civ. No. 20626.   Second Dist., Div. One.   May 31, 1955.]

ALEX A. ROHAR, Respondent, v. HENRY P. OSBORNE, SR., et al., Appellants.

Murchison & Cumming, R. Bruce Murchison and Bicknell J. Showers for Appellants.

Hahn, Ross & Saunders for Respondent.

WHITE, P. J.—Plaintiff instituted this action to recover damages for personal injuries allegedly sustained as a result of the negligence of defendants.

Defendants Henry P. Osborne, Sr., and H. P. Osborne, Jr., operated a hardware store known as Shank's Economy Store. Defendant Ker-O-Kil Manufacturing Company, a corporation, was the manufacturer of the weed burner which was the instrumentality by which plaintiff was injured. Trial by jury resulted in a verdict and judgment in favor of Ker-O-Kil Manufacturing Company, makers of the instrumentality causing the injury and in favor of plaintiff against defendants Henry P. Osborne, Sr., and H. P. Osborne, Jr. Motion for a new trial was denied and from the judgment entered against them on the verdict, the last-named defendants prosecute this appeal.

The complaint tendered three causes of action, in the first of which it was alleged that a certain weed burner had been negligently stored and maintained by defendants Osborne, Sr., and Osborne, Jr. It further alleged that the defendants just named rented the burner to one W. E. Pruitt, the

employer of plaintiff, and was in the physical possession of the latter. The second cause of action alleged the weed burner to be inherently a dangerous instrument, and alleged negligence in the manufacture, storage and rental thereof. The third cause of action alleged a warranty that the weed burner was "strong and of sturdy composition." By their answers defendants generally denied these allegations, and the cause proceeded to trial on the theory of negligence in the manufacture of the burner by the defendant Ker-O-Kil Manufacturing Company, negligence in the storage, maintenance and rental of the weed burner by defendants Henry P. Osborne, Sr., and H. P. Osborne, Jr., and upon the third cause of action upon the theory of warranty as against all defendants.

As to the factual background surrounding this litigation we regard the following as a fair epitome thereof as shown by the record. On May 28, 1952, plaintiff was employed by one W. E. Pruitt, as a general hand on a chicken ranch and was directed to go to the store of Henry P. Osborne, Sr., and H. P. Osborne, Jr. (hereinafter referred to as defendants), to pick up a weed burner which plaintiff's employer had arranged to rent for use on his chicken ranch. This weed burner had been acquired by defendants from the Ker-O-Kil Manufacturing Company, approximately five years before or on or about 1947, and it had been used by both defendants many times yearly without complaint, accident or trouble.

During the same period of time the burner had been maintained also for the incidental use of customers and had been rented to others many times yearly and returned to appellants without complaint or notice of any trouble or failures.

The rentals of the weed burner to defendants' customers usually occurred in the springtime and during the remaining months of the year defendants stored the burner on the concrete floor in a corner of their store.

The weed burner consists of a cylindrical tank with a plate bottom and top, which is welded onto the sides of the tank. At the top there is a 2-inch tube, in which there is a pump similar to a bicycle pump, which may be unscrewed and removed, so that the bottom and the inside of the tank are visible. There is attached to the top of the tank a steel tube which is the outlet for the kerosene, which in turn is connected with a flexible hose at the end of which is a heating coil and fire jet. The kerosene is poured into the 2-inch

hole, the top is screwed on, and the pump is then operated to create pressure inside the tank.

After obtaining the weed burner from the defendants the plaintiff then, at about 8 o'clock in the morning, put three gallons of kerosene in the weed burner, or filled it about two-thirds full and pumped it up to 15 pounds pressure. He put nothing in this tank but kerosene, and he testified he knew the difference between kerosene and any other distillate. He next put kerosene in the torch trough end of the weed burner and took a piece of paper and set it afire, all of which was proper procedure. From the time that the plaintiff obtained the weed burner until the moment of the explosion, no one used it except him. From time to time he would lay the tank down and go about 50 feet away to change a water hose, and then he would return to the tank, pick it up and continue to use it.

He laid the tank down and extended the hose with the flame at the end so no fire or heat would get to the tank— the fire or flame was 6 feet from the tank.

On the last occasion, he then turned the valve down a little, and the flame from the torch was about 3 to 4 inches in length. He set the tank down, went 50 feet to change the water hose and returned to within 3 feet of the weed burner. He was stooping down to pick up the tank, when it failed and exploded.

It is conceded that the burner was delivered to plaintiff with all parts thereof properly affixed and that up to the time of the explosion, as testified by the plaintiff, "it operated normally." There is no question but that both plaintiff and defendants were aware that the burner had been previously used and was a secondhand unit without any fuel therein at the time of delivery to plaintiff. The latter testified he was familiar with the operation of weed burners and had years of experience using them. That he did not read the instructions affixed to the tank of the burner.

The record supports the following contentions advanced by plaintiff:

"An inspection of the tank, particularly Exhibits 1 and 2, show very clearly the rusted condition of the inside of the tank, especially around the bottom where there are large pitted indentures, and particularly around the welding that held the bottom to the sides of the tank. This, of course, is conceded by the appellant and it is very obvious from the exhibits themselves. As to the pressure inside of the tank,

the only evidence on the pressure was that the respondent used the hand pump and pumped up the pressure to fifteen pounds per square inch. The pressure that was exerted or the force that was pushing against the welds where the bottom of the tank was fastened to the sides of the tank was six hundred sixty (660) pounds of total force.

"This tank was not subject to severe internal pressure because there was no bulging of the side walls.

"You can, by visual inspection, determine that there is rust on the bottom of this weed burner.

"The connection of the bottom and the top with the sides of the tank were extremely thin due to the rust condition of the tank, and that caused the failure of the tank."

It might also be stated that rental of the equipment here in question was more or less of a courtesy extended by defendants to their customers and the rental fee was $1.00.

It is first contended by appellants that the court erred in submitting to the jury instructions on the doctrine of res ipsa loquitur. In the case of *Zentz* v. *Coca Cola Bottling Co.*, 39 Cal.2d 436, 446 [247 P.2d 344], Mr. Chief Justice Gibson, speaking for a unanimous court, in a clear and well-reasoned opinion, epitomizes the rule as follows:

"In summary, it appears from the foregoing that, as a general rule, res ipsa loquitur applies where the accident is of such a nature that it can be said, in the light of past experience, that it probably was the result of negligence by someone and that the defendant is probably the person who is responsible. In determining whether such probabilities exist with regard to a particular occurrence, the courts have relied both upon common knowledge and the testimony of . expert witnesses, and they have considered the circumstances relating to the accident in each particular case, such as the extent of control exercised by the defendant, the plaintiff's own conduct, the likelihood of negligence by some third person, and, in some situations, evidence that the defendant is better able than the plaintiff to explain what happened. All of these matters have been treated as aids to help the courts in determining whether the accident was of such a nature that the injury was more probably than not the result of the defendant's negligence."

The same case enunciates the principle that notwithstanding, as in the instant case, the accident occurs sometime after the defendant relinquishes control of the instrumentality, application of the doctrine is not precluded if there is evi-

dence that the instrumentality had not been improperly handled by plaintiff or some third person, or its condition otherwise changed, after control was relinquished by the defendant, provided of course, it is made to appear that "the defendant had sufficient control or connection with the accident that it can be said that he was more probably than not the person responsible for plaintiff's injury." (P. 444.)

In view of the foregoing rules, the main question presented to us is whether from the evidence there was a balance of probabilities pointing to appellant's negligence as the most likely explanation of the accident. If there was, then respondent was entitled to invoke the aid of the doctrine of res ipsa loquitur. ■ Under the facts and circumstances present in the case at bar it would seem reasonable to say that without negligence on the part of someone, the accident would not have occurred.

In the light of common experience and the evidence adduced at the trial, what are the possibilities in this case? We are impressed that they are as follows:

(1) The tank on the burner was improperly constructed by defendant manufacturer;

(2) That respondent's conduct was such that he applied heat to the tank and caused it to fail; and

(3) Improper maintenance and storage by appellants which caused severe rusting of the side walls and bottom of tank, which caused the tank to fail.

As to the first, there was a conflict of evidence. The jury found in favor of defendant manufacturer, and neither appellants herein or respondent challenges the correctness of this finding.

As to the second possibility, the record is barren of any evidence that respondent's operation of the instrumentality caused the failure of the tank. Appellants offer the inference that the substance used in the tank was gasoline and not kerosene. But there is not in the record a scintilla of evidence to support such an inference. The only testimony presented in this regard was that of respondent who stated that he used kerosene, while his employer, who purchased the substance, testified that he purchased kerosene and it was used in the tank.

As to the third possibility, there was testimony that when the tank came back from a previous rental, appellants emptied the liquid out and stored the tank for months with no fluid in it. That this was contrary to the instructions of the manu-

facturer, pasted on the side of the tank and reading: "Keep enough fuel in the tank when not in use so the bottom of the pump is in the fuel; otherwise, check valve may leak kerosene. *Also prevents corrosion.*" (Emphasis added.) There was also testimony that for a period of four years appellants never looked inside the tank or inspected the inside for corrosion, or made any tests to determine leakage. An expert witness for appellants testified, among other things, that he had noticed rusted pits in the bottom of the tank, and that the rust had weakened the welds and the bonds between them, and that one of the causes of the tank exploding was the rust on the bottom of the tank, and that, in his opinion, there were three causes or probabilities which caused the tank to fail and explode:

(1) Excessive internal pressure;

(2) Internal explosion; and

(3) Rust that weakened the welds of the tank.

There was no evidence that respondent put excessive pressure in the tank. He testified that he pumped it only to 15 pounds per square inch, which according to the evidence was far below an excessive amount of pressure. The record is devoid of evidence of an internal explosion being caused by the conduct or action of respondent or anyone else. But, there was evidence of the weakened condition of the welds of the top and the bottom due to rust. In view of the foregoing it seems manifest to us that there is a balance of probabilities pointing to appellants' negligence as the most likely explanation of the accident. The court, therefore, did not err in giving instructions on the doctrine of res ipsa loquitur.

Appellants assert error as a matter of law in the giving of an instruction wherein the following clause was included: "and if you find that from the time the instrumentality left either or both defendants' control to the time of the accident it did not suffer any damage from any person or agency and its *construction* was not changed." (Emphasis added.) Appellants contend that the use of the word "construction" was erroneous as that is not the test; it is whether the "condition" has been altered or changed. As pointed out by respondent, it must be remembered that this action was against two defendants, one the manufacturer, against whom it was claimed that the "construction" of the tank was faulty in that the bottom was affixed in a convex manner instead of a concave. The instruction complained of was

proper as to the manufacturer, in that it dealt with whether the "construction" of the tank at the time of the accident was the same as when it left the manufacturer's control.

In another instruction relating to the cause of action against appellants herein, the court referred to the "condition" of the tank at the time of the accident being the same as when it left appellants' control. Insofar as the respective theories advanced by the pleadings against both the manufacturer and the renters of the tank were concerned, it was important that both the "construction" and "condition" of the tank be mentioned in the instructions. And the court did fully and fairly instruct the jury that insofar as appellants' liability was concerned it was the "condition" and not the "construction" that should be considered by the jury. When the instructions on the doctrine of res ipsa loquitur are read in their entirety as they should be, we cannot see wherein the jury was either misled or confused.

▮ Appellants' next contention is that the court erred in submitting to the jury instructions upon warranty. In that regard the court instructed the jury in the applicable language of section 1955 of the Civil Code which, in part, provides that one who lets personal property must "put it into a condition fit for the purpose for which he lets it, and repair all deteriorations thereof not occasioned by the fault of the hirer and not the natural result of its use." When the instructions given are viewed in the light of the foregoing code section and section 1714 of the Civil Code defining negligence, it is manifest that instructions based on the provisions of these sections were proper in that both code sections constitute the law of this state and are applicable to the issues presented by the pleadings and raised by the evidence in the case at bar (*Monroe* v. *East Bay Rental Service*, 111 Cal. App.2d 574, 575, 576 [245 P.2d 9]). Appellants rely on the case of *Rainbow Petroleum Co.* v. *Union D. & P. Co.*, 115 Cal. App. 275 [1 P.2d 489], but this case does not aid them because therein the action was upon a contract in writing for the rental of oil-well drill pipe. When an action was instituted for agreed rental value of missing pipe, the defendant for the first time complained of defects alleged to have interfered with the success of its project, and to have caused the loss of a portion of the pipe. The appellate court observed that at the time the contract was entered into a representative of the renter called to inspect the pipe and was advised that little was known as to its condition except as to the use to

which it had been devoted, and that " 'if they wanted to rent it, it was up to them' "; that he should " 'take whatever pipe he wanted out of the pile.' " The court simply held that the buyer having purchased after an examination of the property, "will, in the absence of any representations by the seller, be held to have purchased entirely upon his own judgment." The dissimilarity in this case and the one now engaging our attention is at once apparent.

Although admitting there was some conflict in the evidence upon the issue, appellants urge the absence of warranty of the equipment furnished because there was no privity of contract between them and respondent. The record reflects that appellant Henry P. Osborne, Sr., was asked the direct question, "Who did you rent it to?" and replied, "Mr. Alex Rohar (respondent)." Whatever conflict existed as to privity of contract was resolved by the jury against appellants and cannot be disturbed.

Appellants' contention that the instructions made them an insurer against all personal injuries sustained from the operation of the bailed chattel cannot be sustained. The instructions merely advised the jury that the bailor impliedly warranted that he had exercised reasonable care to ascertain that the equipment was safe and suitable for the purpose for which it was hired. This is a correct statement of the law (*McNeal* v. *Greenberg,* 40 Cal.2d 740, 742 [255 P.2d 810]; *Rae* v. *California Equipment Co.,* 12 Cal.2d 563, 569 [86 P.2d 352]). The court also instructed the jury that "You are further instructed that it is the duty of the plaintiff to prove each of the allegations of his complaint, particularly that before you may find against the defendants, Henry P. Osborne, Sr., Henry P. Osborne, Jr., and Shank's Economy Store, you shall require the plaintiff prove some act of negligence, as hereinbefore defined, before you may find against them, and in the event you find that the plaintiff has failed to prove any specific act, then, and in that event, you shall find in favor of defendants."

Appellants' contention that no inspection of the interior portion of the tank could be made is contrary to testimony given by Robert E. Snyder, a qualified mechanical engineer, who testified:

"Q. Now, particularly directing your attention to Defendant's E, I ask you whether or not it isn't true that a

person looking into a closed tank, such as we have here, would be unable to ascertain whether or not there were rust pits in such a tank without the use of microscopes or some other mechanism of enlarging it? A. He could see them.

"Q. You think he could see them? A. I do."

From what we have herein stated, it follows that the court did not err, as claimed by appellants, in denying their motion for nonsuit.

For the foregoing reasons, the judgment is affirmed.

Doran, J., and Drapeau, J., concurred.

A petition for a rehearing was denied June 20, 1955, and appellants' petition for a hearing by the Supreme Court was denied July 27, 1955.