473 P.2d 780

Frances MORROW, Appellant,

v.

TRAILMOBILE, INC., an Arizona corporation, and Pullman, Incorporated, an Arizona corporation, Appellees.

No. 1 CA–CIV 969.

Court of Appeals of Arizona,
Division 1,
Department B.

Aug. 31, 1970.

Rehearing Denied Oct. 2, 1970.

Review Denied Nov. 17, 1970.

Gorey & Ely, by Herbert L. Ely, Phoenix, for appellant.

O'Connor, Cavanagh, Anderson, Westover, Killingsworth & Beshears, by Thomas A. McGuire, Phoenix, for appellees.

HAIRE, Judge.

By a complaint sounding in negligence, strict tort liability and breach of warranty, plaintiff, the widow of Albert Morrow, commenced a wrongful death action against the defendants, who were the manufacturers of the semi-trailer and full trailer between which Mr. Morrow was fatally injured as he was attempting to connect those vehicles. The trial court directed a verdict for the defendants at the close of plaintiff's case, and plaintiff has appealed therefrom.

The evidence when viewed in a light most favorable to the plaintiff and with all inferences drawn in her favor reveals the following facts. Albert Morrow (hereinafter, Morrow) was employed at the Serape Gin in Chandler, Arizona. Shortly before his injury, Morrow was helping driver Loren Babcock, an employee of Cromwell Transportation, Inc., unload his cargo of unginned cotton into an underground storage pit. Babcock was driving "doubles" that evening, that is, the tractor or power unit he was driving was pulling two cargo-bearing vehicles, a semi-trailer and a full trailer. The semi-trailer was connected directly to the tractor. The full trailer was attached to the back of the semi-trailer by means of a hinged drawbar or tongue on the full trailer which fit over a hook located on the back of the semi-trailer. In the process of unloading, the trailers had been disconnected from each other, and at the time of the accident Morrow was assisting in rehitching them. In order to successfully rehitch the trailers, it was necessary that the drawbar on the front of the full trailer be raised slightly above the level of the hook on the back of the semi-trailer so that an opening or "eye" in the front of the drawbar could be brought down over the hook.

The following testimony of the truck driver, Babcock, describes what next occurred:

"Q And would you tell us just what conversations you had with Mr. Morrow before you started this process of hitching up the trailers?

"A Well, it was dark, and I couldn't see, so I told him—I didn't know what his name was at the time—he was a red-haired boy, and I called him, 'Red'.

I told him, 'Let's get a board and p t under the tongue of that trailer, and if I know [knock?] it down I can always pick it up and put it back up there.'

I said also, 'I'd not like to hurt somebody or kill somebody with this truck.'

He said, 'Well, I have done it a year or better and nothing has ever happened.'

And I told him there was a first time for everything.

\* \* \* \* \* \*

"Q Now, did you then start after this conversation and he said that he had done it before?

"A Well, I kind of hesitated for a few minutes or a few seconds, rather, urging him to get a board so he wouldn't have to get between those trailers, but he insisted on getting in there and hooking it up, and then he said, 'Well, let's hook them up. There is another truck there sitting back there waiting to unload, and I have got to get it out, too.'

So then I went ahead, and I got in the GMC."

Babcock backed up slowly, watching for a prearranged flashlight signal from Morrow to indicate when the two trailers were sufficiently close together. After backing as far as he thought was necessary, he set his brakes, got out of the cab and looked back again, only to see that he in fact needed to back up farther. He then proceeded again slowly, but still seeing no signal from Morrow, he became worried, stopped and got out of the cab again and went back to the area between the trailers. Although an area about 18 inches in width still remained between the trailers, he found Morrow, " \* \* \* between the wheels on the front trailer on his knees with his arms hanging down to his sides."

Plaintiff, Morrow's widow, subsequently brought this suit against the manufacturers of the trailer and semi-trailer, Trailmobile, Inc., and Pullman, Inc. (hereinafter collectively referred to as defendants). On this appeal from the directed verdict for the defendants, we will discuss separately the theories of liability urged by plaintiff.

## NEGLIGENCE

In considering the question of negligence it is important to keep in mind that this case does not in any way involve questions concerning the liability of the decedent's employer or the driver of the truck or the truck driver's employer. They were not made parties to this litigation. We are only concerned with the alleged negligence of the manufacturers of the two trailers.

■■■ Although plaintiff's complaint alleged that defendants were negligent in the *design, construction and manufacture* of the trailers, there was no evidence or contention of negligent construction as opposed to negligent design.[1]

Therefore, in considering plaintiff's negligence claim we are only concerned with the contention that the product was negligently designed.

■■ It is well established that the manufacturer of a product is not " \* \* \* an insurer that his product is, from a design viewpoint, incapable of producing injury." Annot., 76 A.L.R.2d 91, 95 (1961); *see also* Jamieson v. Woodward & Lothrop, 101 U.S.App.D.C. 32, 247 F.2d 23 (1957); Campo v. Scofield, 301 N.Y. 468, 95 N.E. 2d 802 (1950); Blissenbach, a minor, v. Yanko, 90 Ohio App. 557, 107 N.E.2d 409 (1951). The manufacturer's duty is that of exercising reasonable care under the circumstances. Annot., 76 A.L.R.2d 91, 95 (1961); W. Prosser, Handbook of the Law of Torts § 96, at 665 (3d ed. 1964); Restatement (Second) of Torts §§ 395, 398 (1965).

The defendants, in urging support of the trial court's directing a verdict in their favor, seek to make much of the fact that the two agricultural flatbed[2] trailers involved herein were ordered simultaneously as a

---

1. The distinction between the two is that negligent *construction* is carelessness in the actual putting together or building of the product, whereas negligent *design* involves improper planning of the product. Maynard v. Stinson Aircraft Corp., 1 Av. Cas. 698, 704 (Mich.1937).

2. Side panels (called "racks") were subsequently ordered from and supplied by defendants as were conveyor belts which were installed in both trailers. These alterations permitted hauling of bulk commodities. . .

unit, and that the purposes for which they were initially ordered—hauling of bailed and non-bulk commodities capable of being side loaded and unloaded—did not require frequent hitching and unhitching of the two trailers. While this assertion is, in its factual portion, supported by uncontradicted evidence, we fail to see that it is dispositive of the overall issue here, though it may be one of the "circumstances" with reference to which the defendants' duty to exercise reasonable care is to be determined. As we see it, the real question is this: On those occasions when these vehicles were *in fact* required to be unhitched and subsequently hitched back together, was a person in the position of plaintiff's decedent subjected to an unreasonable risk of harm by any failure of the defendants herein to exercise reasonable care in designing the hitching mechanism? All the evidence presented by plaintiff requires this question to be answered in the negative.

▮ We note at the outset that the evidence was clear that in order to connect the trailers it was not necessary by virtue of their design for any person to ever stand between the two vehicles while the forward vehicle was in motion and subject himself to the risk of being crushed. The drawbar of the rear vehicle could have been held at the height required to allow it to slip over the hook on the forward vehicle in any number of mechanical ways. These included (1) a chain running from the forward part of the drawbar back to the forward part (front rack) of the full trailer; (2) a jack; and (3) a "drop arm". The plaintiff's case was replete with uncontroverted evidence that such mechanical devices were available from or through the defendants but that Babcock's employer, Cromwell Transportation, Inc., intention-

ally ordered the vehicles and their connective parts [3] without such devices. The following testimony was elicited upon cross-examination of Mr. Cromwell:

"Q Now, with respect to the attached drop arm or a jack attached to the tongue on a pull trailer or a full trailer, did you ever try attaching a device to the draw bar?

"A Yes, we have.

"Q Was it successful?

"A No. There were two reasons basically. Well, three. First, it adds weight. Secondly, it is either torn off. Thirdly, or more importantly, it is not adjustable, so it still wouldn't be the correct level. It will have to be a block under it or a hole dug in the ground to make it.

"Q When you ordered these trailers you knew that Trailmobile would sell or order a jack bar if you ordered it?

"A Yes, sir.

"Q You didn't want that?

"A No, sir."

It was Cromwell's further testimony that there were two jacks at the Serape Gin on the night of Morrow's death, though this was impugned to some slight degree by Babcock's testimony, before admitting he failed to actually look for a jack, that he didn't see either of them.

Assuming that the defendants in the exercise of reasonable care should have anticipated that a person would stand between the vehicles to connect them notwithstanding the easy availability of such mechanical devices which would obviate the need for so doing, we feel that all of plaintiff's evidence clearly establishes that defendants acted prudently in discharging any such assumed obligation. The evidence

3. Much examination and, consequently, much cross-examination was directed at whether the rear trailer should have been a full trailer connected by its hinged drawbar to the front trailer's hook—as it was —or a semi-trailer resting upon the "fifth wheel" of a converter dolly. Cromwell explained its choice of the former over the latter as being based upon the facts that the trailers were constantly going over rough terrain, that "fifth wheels" were relatively unsuited therefor, if not dangerous, and that the inflexible connective device on the front of the converter dolly was likewise inappropriate for such agricultural hauling.

discloses that the drawbar of the rear trailer was light enough to be held up at the requisite height by a worker using only one hand. So long as the drawbar was held in the approximate area of the hook, even if the person standing between the vehicles missed the hook he would strike the hitch plate on the semi-trailer and this would keep the vehicles from coming so close together as to crush anyone between them. (That Morrow failed to so hold the drawbar is established by uncontradicted testimony to the effect that after the accident the drawbar was resting on the semi-trailer's dock bumper located beneath both the hitching plate and the hook itself).

■ As a separate and more fundamental basis for determining that plaintiff failed to prove that defendants breached any duty owed to plaintiff's decedent, we think the following language from Campo v. Scofield, 301 N.Y. 468, 95 N.E.2d 802 (1950) is apropos:

"If a manufacturer does everything necessary to make the machine function properly for the purpose for which it is designed, if the machine is without any *latent* defect, *and if its functioning creates no danger or peril that is not known to the user, then the manufacturer has satisfied the law's demands.*" (Emphasis supplied). (301 N.Y. at 472, 95 N.E.2d at 804).

Plaintiff did not allege nor prove that these trailers or their hitching devices constituted a latent defect or presented a latent danger. From all of plaintiff's evidence, twelve reasonable men could come to one conclusion only: that there was no latent defect in defendants' trailers and that any danger presented to plaintiff's decedent by reason of the plan or design of the trailers or their connective devices was open, obvious and known to him. Where such is the case, a directed verdict for a manufacturer on the question of its negligence in design is proper. Maas v. Dreher, 10 Ariz.App. 520, 460 P.2d 191 (1969);

Daugherty v. Montgomery Ward, 102 Ariz. 267, 428 P.2d 419 (1967).

## STRICT TORT LIABILITY

■ It is the law of this state that one engaged in the business of selling a product which is expected to and does reach the user or consumer without substantial change in the condition in which it is sold, is liable for the harm caused by reason of selling such a product in a defective condition unreasonably dangerous to the user or consumer or his property, irrespective of the seller's exercising all possible care in the preparation and sale of his product, and notwithstanding the lack of a contractual relationship or a direct sale between the seller and the injured party. Restatement (Second) of Torts § 402 A (1965); O.S. Stapley Company v. Miller, 103 Ariz. 556, 447 P.2d 248 (1968); Estabrook v. J. C. Penney Company, 105 Ariz. 302, 464 P.2d 325 (1970), vacating 10 Ariz.App. 114, 456 P.2d 960 (1969); Bailey v. Montgomery Ward and Company, 6 Ariz.App. 213, 431 P.2d 108 (1967); Tucson General Hospital v. Russell, 7 Ariz.App. 193, 437 P.2d 677 (1968); Eck v. Helene Curtis Industries, Inc., 9 Ariz.App. 426, 453 P.2d 366 (1969); Caruth v. Mariani, 11 Ariz.App. 188, 463 P.2d 83 (1970), reversing on rehearing 10 Ariz.App. 277, 458 P.2d 371 (1969); Wagner v. Coronet Hotel, 10 Ariz.App. 296, 458 P.2d 390 (1969); Maas v. Dreher, *supra.*

■ However, as noted in Maas v. Dreher, 10 Ariz.App. 520, 521, 460 P.2d 191, 192 (1969), "Strict liability cannot be equated to absolute liability", and the product sold must be in a defective condition unreasonably dangerous to the user or consumer (*see* Restatement (Second) of Torts § 402 A, comment i (1965) ). In *Maas, supra,* this Court held that an open and obvious condition known to the injured party could not be, under the facts established therein, an "unreasonably dangerous condition" within the meaning of Restatement (Second) of Torts § 402 A (1965)

and the cases upon which it was based.[4] We reach the same result herein.

It is to be emphasized that in determining that any danger created by defendants herein was—under the uncontradicted evidence—open, obvious and known to plaintiff's decedent, we do not reach any question as to the latter's contributory fault in this matter. The following language in Maas v. Dreher makes this clear:

"Plaintiff contends that in order for the above principles to apply, not only must the condition be open, obvious and known to plaintiff, but in addition it must be shown that plaintiff subjectively appreciated the danger involved, and that in Arizona this issue must be submitted to the jury under appropriate instructions relative to contributory negligence or assumption of risk. The subjective appreciation of danger by plaintiff might well be pertinent in establishing these affirmative defenses to the extent that such defenses are applicable in strict liability cases. However, in this case we do not reach the question of affirmative defenses. As previously stated herein, one of the elements which *plaintiff* must prove to establish a cause of action in strict liability is that the product was 'in a defective condition unreasonably dangerous'. This is determined by an objective test, not by the particular plaintiff's subjective appreciation of danger. As stated in the Restatement (Second) of Torts Sec. 402 A, comment *i* at 352 (1965):

'The article sold must be dangerous to an extent beyond that which would be contemplated by the *ordinary consumer* who purchases it, with the *ordinary knowledge common to the community* as to its characteristics.' (Emphasis supplied.)

"From the foregoing it is clear that as a part of plaintiff's case plaintiff was required to show that the condition which caused her injury * * * was dangerous to an extent beyond that which would be contemplated by the *ordinary consumer* with *ordinary knowledge* common to the community. If plaintiff had established a *prima facie* case for liability, including a showing that the * * * [product] was dangerous to an extent beyond that which would be contemplated by the ordinary consumer, then plaintiff's subjective appreciation of the danger might have become material on the issue of assumption of risk. See O. S. Stapley Co. v. Miller, *supra*; Restatement (Second) of Torts Sec. 402 A, comment *n* at 356 (1965)." (Emphasis in original). (10 Ariz.App. at 522–523, 460 P.2d at 193–194).

All of plaintiff's proof established that any danger presented by reason of the design of defendants' trailers was open, obvious and known to plaintiff's decedent; twelve reasonable men could not have reached any other conclusion after viewing the photographs admitted into evidence and hearing the testimony of plaintiff's own witnesses on direct examination. Under such circumstances the trial court was required to direct the verdict for defendants, plaintiff having failed to prove an essential element of her strict liability claim. *Maas, supra*; Tucson General Hospital v. Russell, *supra*.

### EXCLUDED EXPERT TESTIMONY

As shown by the foregoing, plaintiff's evidence was insufficient to prove either

---

4. For example, the landmark case of Greenman v. Yuba Power Products, Inc., 59 Cal.2d 57, 27 Cal.Rptr. 697, 377 P.2d 897 (1963), was quoted in Maas v. Dreher, 10 Ariz.App. 520, 522, 460 P.2d 191, 193 (1969), as follows:

"'To establish the manufacturer's liability it was sufficient that plaintiff proved that he was injured while using the [product] in a way it was intended to be used as a result of a defect in design and manufacture of which plaintiff *was not aware* that made the [product] unsafe for its intended use.' (Emphasis supplied.) (27 Cal.Rptr. at 701, 377 P.2d at 901)."

**584**

of her claims and in fact negatived their existence. It is plaintiff's final contention that the trial court erred in excluding certain expert testimony offered by plaintiff.

■ Plaintiff proffered the testimony of a Mr. Krussman, an engineering expert, and when the trial court sustained multiple objections of defendants to the propriety of questions propounded by plaintiff's counsel, an offer of proof was made in chambers. The offer of proof which, as to Mr. Krussman, consisted of his direct examination by plaintiff's counsel,[5] indicated his opinion that the design of the hitching devices was not as safe as it could be because it lacked a device or mechanism to hold the drawbar at the level required for it to be slipped over the hook on the front trailer (the semi-trailer). Assuming, *arguendo*, that the trial court improperly excluded this testimony, its presence before the jury would not have allowed any different result from that which occurred.

■ Expert testimony that the design adopted by defendants was not the safest available does not constitute proof of negligence since a manufacturer has no legal obligation to produce a product incorporating only the ultimate in safety features, Marker v. Universal Oil Products Company, 250 F.2d 603 (10th Cir. 1957); Mondshour v. General Motors Corporation, 298 F.Supp. 111 (D.C.Md.1969); Mitchell v. Machinery Center, Inc., 297 F.2d 883 (10th Cir. 1961); nor to produce a product incapable, from a design viewpoint, of causing injury, Krentz v. Union Carbide Corporation, 365 F.2d 113 (6th Cir. 1966); Stevens v. Durbin-Durco, Inc., 377 S.W.2d 343 (Mo.1964). Further where, as here, the absence of a safety device is apparent and the danger presented thereby is open, obvious and known, the lack of a danger unknown to the decedent bars his recovery. Messina v. Clark Equipment Company, 263 F.2d 291 (2d Cir. 1959); Yaun v. Allis-

Chalmers Mfg. Co., 253 Wis. 558, 34 N.W. 2d 853 (1948); *cf*. Iacurci v. Lummus Company, 340 F.2d 868 (2d Cir. 1965). Expert testimony in the foregoing situations that a safety device is needed is therefore insufficient to establish a *prima facie* case of negligence in design. Yaun v. Allis-Chalmers Mfg. Co., *supra*; Mitchell v. Machinery Center, Inc., *supra*; Iacurci v. Lummus Co., *supra*. To the extent, if any, that plaintiff's expert testimony pertained to the strict liability claim, we find our prior discussion regarding the disposition of that claim equally applicable thereto.

The only remaining theory of liability urged in plaintiff's complaint was based on warranty. This count has been voluntarily abandoned on appeal, and therefore we do not discuss it.

The judgment of the trial court is affirmed.

EUBANK, P. J., and JACOBSON, J., concur.

---

5. Plaintiff's counsel did not call into chambers his other expert witnesses but rather indicated by avowal their qualifications and the substance of their testimony. This additional testimony was to be to the same effect as that of Mr. Krussman, i. e., the trailers and their hitching devices were unsafe by reason of the failure of the defendants to include a device or mechanism to elevate the drawbar.